and William Gardner, M.D. On behalf of the athlete, Mr. Joe Handler, on behalf of the There are two orders that are on appeal before your honors. One deals with the June 10th, 2009 order that precluded the plaintiff's expert, Dr. Steven Bernstein, from testifying that Dawn D. Filippis' medical bills were approximately caused by the problems that she experienced from the birch procedure performed by Dr. Gardner on May 12th, 1999. The second one deals with the September 9th, 2009 order, which granted the defendant's motion for summary judgment. Your honors are familiar with the facts of the case. I would like to focus on the applicable rules of law governing both orders that clearly show why these rules confirm why these two orders should be reversed. In dealing with the June 10th, 2009 order, I'd just like to go back and say what prompted, what led to this, to that order. And the record shows that there was an agreement reached on September 5th, 2008 between the attorneys from the parties concerning the medical bills. The medical bills in question were replete with information about insurance, and I was trying to find a way that would simplify things, and I thought we had reached an agreement with regard to those medical bills by virtue of a stipulation which I prepared on September 11th, 2008 and submitted to counsel for the defendants. Did the agreement have to do with whether the bills were reasonable and necessary to the exclusion of whether they were proximately caused by the actions? No, Judge, it covered the whole bit. It covered proximately caused? Yes, because if you look at the stipulation itself, the stipulation covers all three facets. And I would refer you, Your Honor, it's in the record at, sorry, 1372 to 1381. Specifically, that stipulation had a provision that said here, the parties, I'll just read it, it's just very short, the parties hereby stipulate that Dawn DeFilippis incurred $100,000, $155,058 in medical expenses that were reasonable, necessary, and related to the complications she experienced following the Birch procedure performed by Dr. William Gardner on May 12, 1999, and then lists all the expenses. So I know counsel had indicated in the athlete's brief that there's no reference to it. There is a reference. It is in the record. That was the stipulation. And... Now, isn't it or wasn't it plaintiff's burden to show which damages were attributable to the Birch procedure and which to the other procedures she had on that day? No, all of these damages pertain to the Birch procedure. The oophorectomy in question, there's no way that the oophorectomy could have caused any of these things. In fact, when we brought, when we filed our response to the motion for summary judgment, and one thing I did not put in the briefs, Dr. Gardner confirmed during, and this is attached to our memorandum in support of our, in opposition to the motion, the motion for summary judgment, that the various problems that Dawn DeFilippis experienced following his performance of the Birch procedure, everyone for this entire case, for the entire time I've been involved in this case, we're talking about the Birch procedure. The first time that the oophorectomy ever was raised was raised by when we started getting these motions that are before your honors. That's the time. There was never a question. In fact, Dr. Gardner testified in his deposition he had never had problems like the ones that were incurred by Dawn DeFilippis as a result of him performing a Birch procedure. Did your complaint mention it? The ovary? Oh, sure, sure. I'm not disputing that there were two things done to her on May 12th, 1999. But what I am saying, and there's no, I don't think that there will be an expert, even the defendant's expert will say that the oophorectomy had anything to do with the complications that she experienced following the Birch procedure. And it would be, you know, it would be very simple, your honor, if that was the case, then why didn't Dr. Brubaker, the defendant's expert, in her, in their 213s, in the deposition say, you know what, the whole problem, you're missing the boat here. These are the problems caused by the oophorectomy. Would her bills have been less, just in general, if she had not had the ovary type of cysts removed from the ovary? Well, if you saw the bill that was, that is attached, that Dr. Gardner issued, that was solely, it says, laborotomy. Laborotomy goes with the, with the Birch procedure. It does not go with the oophorectomy. So, and that was one of the issues that we brought before the circuit court. We said to the circuit court, you know, at a minimum, even if you're going to exclude these bills, you've got to let Dawn DeFelipis testify that she wouldn't have incurred the bill, the $2,500 bill from Dr. Gardner because she wouldn't have gone forward with the procedure had she known what the risks and complications and the alternatives were. So, addressing this, we, we had a disagreement. So what did I do? I immediately contacted Dr. Bernstein and we submitted a supplemental opinion. We revised our 213s to deal with this issue. The supplemental opinion that was tendered was with some supporting documentation that really just listed the dates, the doctors, and the amounts, not what was performed. It was just kind of a chart that somebody prepared. Correct. But again, because... But the bills themselves were not submitted until there was a response to the motion to dismiss. The bills were submitted as part of the stipulation, Judge, and they were attached. In fact, I have it here. They were attached when they sent the letter on September 11th. So all the bills, there was going to be the stipulation, but what would be submitted to the jury had this case proceeded would have just been the stipulation. But the bills themselves were disclosed then when the stipulation was proposed? Oh, absolutely. And that was on 9-11-1? 9-11-08. Okay. Those bills were, they had those bills beforehand. They had those bills beforehand. It's just that we put it together, they were replete with reference with regard to insurance, and therefore I couldn't, you know, again, it just couldn't be shown to a jury. I couldn't redact sufficient enough. The jury would know exactly what we were doing. Yeah, I have a question based upon the record of the briefs that I'm a little confused about. The trial court entered an order saying the motion to bar is granted, and really there's nothing, there's no record in the record on appeal as far as what the ruling was, what the basis of the ruling was, or actually what the extent of the ruling was. My question is, I know the opinion was excluded, the opinion that these were proximately caused, these bills were proximately caused. Were the bills themselves excluded? Well, he, by making the ruling, yeah, he excluded the bills, but then I came back on a motion to reconsider. Well, you already filed two motions. Right, so I filed two motions to reconsider. I said, at minimum, you've got to at least let me bring in the bill with regard to Dr. Gardner, because she can testify to that. I don't need an expert to be able to testify to that. She's the one who said, I wouldn't have incurred the bill. So that's the, that was the quandary, that was the problem that we had. So what did I do? So we did this, the court denied it. But when you look at the six factors that the courts have indicated that one looks at to determine whether a witness should be precluded from testifying following a claim violation of 213, they all need to be included.  So the defendants have a mandate in favor of allowing these bills to come in. Now, the defendants don't address that, these six factors, in their brief. But let's look at them. Surprise to the adverse party. There was no surprise to them whatsoever. We were talking about the stipulation for months to get, you know, to expedite the trial. So there was no surprise. The prejudicial effect of the witness's testimony, how would there be any prejudice to it at all? I don't see there's any prejudice in the nature of the testimony. They already, the defendants already said, we're going to stipulate they're reasonable and customary. So how the defendants can say, well, could have been related to the oophorectomy. Well, then introduce evidence to that effect, but it wasn't. There's no way, and I really challenge the defendants that they can come before this court in good faith and say it possibly could. It can't. It won't. So then you have the diligence of the adverse party. Well, there is the big issue, and that's that Bagnard case, that 5th District case that I cited, as well as the Smith decision. Here you've got a situation where they had, we submitted in November 2008 the opinion about their approximately cost. What did they do? They waited five and a half months, sat on it, and then claimed, claimed that, well, it took them that long. That was in their response that was filed in the circuit court, that they were reviewing the file. I submit that this file is extensive, but I submit to this court it doesn't take five and a half months to review this file to determine what you're going to do. You know, this is their purpose, to avoid the tactical gamesmanship that the courts talk about. And here I think you have a prime example of the tactical gamesmanship being employed here. Could the court have found that you were negligent in how you treated the so-called proposed stipulation? I don't think so, Judge. I really don't think so. There was never at any point in time where approximate cost language was associated with stipulation until you got into 08. Right, because I never thought that there was an issue in speaking with the attorneys for the defendant that there was going to be an issue. Now, should I have gotten a stipulation earlier? Perhaps, but the case wasn't ready for trial yet. There was never an issue in my conversations with the attorneys for the defendants in which they indicated, you know, Joel, there's going to be a situation here. We can't do this. Okay? If that was the case, I would have done this a long time ago. But again, you know, I've been around the block, you know, and you listen to what your opponents say, you trust what your opponents say, and you have a working relationship. And then it went south. So what we had to do is we had to take alternative measures by virtue of this, what we deem a reneging of the agreement. Why wouldn't this have just generally been part of your 213 disclosure, if not the 213 disclosure, a supplemental disclosure either before or immediately after the debt, right around the time of the debt, which was in September of 05? Because all these bills were incurred except for two of them before the debt. Correct. The problem with that, Judge, well, it wasn't a problem. It's just that, again, from the outset of the case, in my discussions with the attorneys for the defendant, there was never an issue as far as the bills. The bills were going to be stipulated to them. So that's the reason why I took them for their word, and that's what I did. So I didn't think it was necessary to put it into that since the bills were going to be stipulated. When the disagreement occurred, then I put it in. But the point is, if you look at that Bednar decision, they say, and that was even a shorter period of time than ours, five and a half months. And the courts say, you should have come in, you should have gone ahead and addressed this before the circuit court defendants, and then you would have been given time to go ahead and get it done. And it could have all been done within the five and a half months. It's not that difficult of a situation with regard to the bills, especially when we had them all itemized out. But then the doctor may have had to be re-deposed on that issue. And I already had indicated to them, Judge, that I would tender him. No questions asked. Okay? No questions asked. So if the other side gets up and says, you know, we talked about a stipulation, but we didn't really have a stipulation, are we to find that it's reasonably diligent for an attorney to, on the hopes of a stipulation, not tender discovery between 05 and 08? Judge, when you see the defendant's letter response of September 11th to me, where the word agreement, you know, there was an agreement. And she used the word agreement. And that is, here, in RC 1383, Judge, it says, it does not, you know, it says we have received your proposed stipulation regarding medical bills. It does not reflect our agreement discussed on September 5th. There was an agreement, Judge. You know, as I say, I'm not here to start indicting the defense, the attorneys for the defendant. I'm trying to get to trial on this case. So getting back with regard to the timeliness, I do not believe that their objection was timely here. And they didn't exert diligence. And the good faith on our part, well, I think we did exert good faith. You have other damages that you could go to trial with. Absolutely, Judge. I raised that before Judge Stark. I said, and that was in the memorandum. I said, you know, this is not the only thing that, you know, the IPI gives us other things that we could go to damages on. Yet, again, I can't put myself in the mind of Judge Stark as far as why he ruled the way he did. But that's why we moved to consider on two occasions. But when you take all those factors into consideration, they all point in our favor. They don't point in favor of the defendant. And that's why I believe, at least with that June 10th order, that order should be reversed by this court. These factors arose from the turning case? Well, they arose from the turning case. The defendants cite and say, well, that dealt with a different section. But yet the cases that they cite, they cite the identical factors, the same six. So it's just regardless of what section, whether you're dealing with the Illinois Civil Practice Act or you're dealing with the Illinois Code of Civil Procedure, it has withstood the test of time. Those are the six factors. Now, with regard to the summary judgment order of September 9th, 2009. Let me ask you a question. Sure, Judge. Which is not part of the written record. And you reply, the judge said A. And then we asked the opposing counsel, and she said the judge replied B. Can we consider that as evidence for purposes of a decision in the case? Are we restricted to only the record before us? I think under the case law, you are restricted to what the record indicates. But we don't have a transcript with regard to the June order. OK, we do have a transcript with regard to the September 9th order. But you really don't get a definitive statement from Judge Stark as far as why he ruled the way he did. You know, he said, well, we're dealing with proximate causation. But he really doesn't. He just says you didn't do it. And that was it. What's your take on that? Was it the damages because they were excluded? The bills were excluded? I think that it was just. Or was it the difference that you didn't distinguish between the cyst removal and the operation? Judge, I think it was like a carryover. I think that he found that because he ruled the way he did in June, that it just carried over and that you won't be able to prove damages, even though he raised in opposition to the summary judgment the fact of there are other damages that one must, you know, that he would, that Dawn D. Philippus would be entitled, that Frank D. Philippus would be entitled. And I don't think it was about this. Again, this issue of the oophorectomy. And in fact, even if you look, and this is why I find it somewhat odd that the defendants raised this for the first time, you know, toward the end of the case, but even when you look at their response here that they filed with this court, what do they say in the first sentence right out of the box? The medical negligence case arose when Dawn D. Philippus encountered complications after Dr. Gardner performed a birch procedure to address urinary incontinence issues. This oophorectomy is a red herring. It is an absolute red herring at all. There will not be, if your honors are inclined, and I hope you are, to reverse here, this is not, there's going to be no evidence that's going to be going to trial about the oophorectomy caused these complications. It's going to be about informed consent on the issue of the birch procedure. And I know I'm digressing a little bit, but on that issue, they seem to imply that merely because, you know, you're not making an issue about the oophorectomy, that you can, you know, that's not right. There's not one case in Illinois that says that. If you just give you, if you're doing two procedures and I only give you informed consent on one, it somehow carries over to the other procedure. It just doesn't happen. If you look at a central theme of the expert's opinion regarding the quote unquote injury to the plaintiff, it all relates to the urinary problem. Absolutely. It all stemmed from the urinary problem. Dawn DeFilippis testified in her deposition about the problems she was saying. And it was, what were the problems? Urinary incontinence. You're not going to get urinary incontinence after an oophorectomy is performed. Just not going to get it. And that's why it wasn't dealt with. Because it's not, it's a non-issue. It really is a non-issue. So, we have, and we've cited in our, in our things here. First of all, did they, did the defendants maintain their burden before the court of showing that a reasonable person in plaintiff's circumstances would not have declined the surgery after being properly informed of the risks, of its risks and alternatives, and would not have refused the surgery? They don't even address it. They don't even address it at all. That's their burden. That's not my burden. That is their burden. And that's not even addressed in the briefs. And then there's four elements, you know, they cite three for just dealing with the general rule of law, dealing with men and male cases. But I focused on the four elements that are, are, have to be shown for an informed consent case. Because that's what this is, an informed consent case. Did the doctor have a duty to disclose material risks and alternatives? They don't disclose that. Did he fail to disclose? Question of fact here. He said he did. We said he didn't. Three, directs and proximate result of the failure to disclose a plaintiff consented to the treatment she otherwise would not have consented. Daunte Philippus testified that she wouldn't have consented if she was informed. Right? And she was injured. She was injured. The 213 answers indicate that. Dr. Bernstein indicated that she was injured. Even Dr. Brubaker said that she was injured. Daunte Philippus testified in her deposition that she was injured as a result of, as a result of this. Now, the, the, the, again, this is where the oophorectomy is being raised by the defendants for that fourth element. And again, I don't see how it's, it has any application here. So when you take all things into account, the court was incorrect, Your Honors, in entering that June 9th order. It was incorrect in entering summary judgment on September 9th. But Dr. Bernstein, from the standpoint of the surgery performed, he agreed that the doctor doing the surgery performed the surgery in a proper manner. Correct. That's not under attack. That's not an issue. The only issue is informed consent. Informed consent. And as a result of not having the informed consent, consequently there was surgery. And because of the surgery, it was foreseeable that that surgery would cause the plaintiff trouble into the rest of her life. And she would have refused the surgery had she been given the appropriate informed consent. That's the theory. That's the theory. Correct. The fact line. But again, that's a question of fact for the jury, not to be decided on the motion for summary judgment. Now what you see in the defendant's brief also is the defendant wants to weigh the evidence in terms of the credibility of Dr. Bernstein's testimony. That's not, that's for the jury to determine. That's not for a judge to determine on summary judgment. If we present the evidence, we have to, then we have satisfied our burden and it goes to trial. Would there ever be an arguable problem with the bills if instead of a cyst on a tumor, which is part of your, you know, obviously the internal cavity of the body where the surgery was done, if instead there was some type of little cyst on the outside of her arm, and while in doing the surgery for a urinary problem, the doctor, you know, removed the cyst, would you then have a potential argument regarding the bills? I don't think you will because, I don't think you would judge because I think there you would be able to differentiate because if, again, it would be only the bills pertaining to the birth procedure. So if bills are, you know, there are separate bills from that or even within a bill, it's broken down. Remember, Dr. Gardner's had made no reference whatsoever of a oophorectomy. It was only the laparotomy. So then you could just segregate it out and say, well, it's a $2,500 bill. $1,200 pertaining to the birth procedure. That's all we're seeking. Was there any attempt by anybody to make a motion before the Court to eliminate any discussion about the ovary problem as being waived or forfeited or not part of the case for purposes of all the discovery that was done? No, Your Honor. And that didn't pop up until? It didn't pop up, Judge. Oh, wait. You see, that's the thing. It didn't pop up until the arguments were raised by way of the summary judgment. That's when, and this motion to bar the bills, that's when the first time it was raised. It was never raised. If you go through and you read Brubaker's deposition, you read Bernstein's deposition, you read everything, all the discovery that has been produced by both sides, it's a lot of stuff. There is no mention with regard to the oophorectomy other than it did occur, but it's not an issue in this case. It really isn't. Taking all those things into account, we would request, plaintiffs would request that you reverse our decisions. Yes, again, so. Your time is up, so if you have anything to, as a quarter, you can go ahead and you'll be able to respond and reply. Very good. Thank you for your time. Good morning. I'm Linda Spring. May it please the Court, Mr. Norman. I represent the defendant, Dr. Gardner. I was not going to spend very much time on the proposed stipulation, but it seemed that we spent an awful lot of time on that. I want to remind the Court that all that is in the record about this proposed stipulation is the letter from the defendant's office, the defendant's counsel's office, on September 15th of 08 and the plaintiff's letter in response on November 26th of 08. That's 1383 and 1372, and the page is following 1372. There's nothing in the record about the supposed discussions between the plaintiff's counsel and the defendant's counsel for years during this case or what the plaintiff's counsel may have assumed about the bills. None of that is in the record. The counsel cited 1383 where he indicated a letter was from you? Yes, from our office. Or someone indicated that you had an agreement regarding the stipulation? This letter says, We have received your proposed stipulation regarding medical bills. It does not reflect our agreement discussed on September 5th, 2008. We will stipulate that the medical expenses that were actually paid were reasonable and customary for those medical services. This was done to alleviate your need to bring in a medical billing records custodian from each provider. That's what the letter says. There clearly was some type of discussion. There was no probable cause or approximate cause in that letter? You weren't agreeing to approximate cause? The defense was not agreeing to approximate. It was from a different attorney in our office. The defense was not agreeing to approximate cause. And if asked, I don't know what the plaintiff's attorney assumed, but the defense would never agree that the bills were approximately caused. That's the case. So I'm not sure why the plaintiff assumed that he was not going to have an issue of establishing approximate cause, but I again remind this court that what is in the record about the stipulation are the two letters. There's a reference to a prior, some kind of prior agreement or discussion that is not memorialized, and this is what's here. So for the plaintiff to talk for 10 or 15 minutes as he did about what he thought and what we agreed to and how we reneged, that's improper and is not part of the record. And we objected to that in the brief, and we objected to that again. Let me ask you, the six elements that the claims counsel mentioned, do you agree that those elements should be considered for purposes of determining whether or not part of the discussion in the 213? Yes, and I think that they were discussed. They were simply not enumerated. And I was going to discuss that for a second, but I'll discuss it now. So I have to find my page for it. Surprise. Disclosure was four years after the 213 disclosures and three years after Dr. Bernstein's deposition. Never any discussion until this disclosure that he was going to say that the bills were approximately caused by the failure to obtain informed consent. That's surprise. Prejudice will affect right before trial, and this is the third or fourth trial date that we've had in this case. We now have to re-depose the plaintiff's expert and present our expert for deposition. Plaintiff says we never talked about the medical bills. In fact, the defense has no obligation to make the plaintiff's case. And if the plaintiff's not going to talk about the medical bills, we are not going to. Now, you have six months to depose Dr. Bernstein, and yet you didn't bring your motion until one month prior to the trial date. That's true. And you used some, you know, like very loose language for explaining why it took you six months or five months to bring it before the court. That's true. And avoid potential prejudice. Excuse me. I'm sorry for interrupting you. Yeah, go ahead. I think that no matter when the motion was brought, it should have been granted because of their delay. And for the plaintiffs to put on the defendants that somehow our delay in telling them that they're way too late is prejudicial, I think is a very courageous statement for them to make. They're the ones that waited, and it is not our obligation to tell them what's the matter with their case. It was not properly disposed under 213, and it would have been barred whenever we brought the motion. Now, under 213, you could secondarily substitute additional discussion. Yes. And when you look at the wording, seasonably substitute, doesn't that relate to the prejudicial effect? And didn't the fact that you waited for five, almost six months to bring the issue up and avoid taking a deposition sort of move in the plaintiff's favor? No, Your Honor, I don't think so. In the first place, of course, we didn't avoid taking the plaintiff's expert's deposition. We took his deposition, and we asked him, did he have any more opinions regarding proximate cause, and he said no. I'm talking about the deposition regarding the supplement. The additional deposition. But the obligation to seasonably supplement means when the expert forms new opinions, then those opinions have to be disclosed. But there has to be some reason why the plaintiff's expert has new opinions. And what usually happens in these cases, in my experience, is the plaintiff has had additional surgery, or some changes have occurred, or the defense expert has some opinions that the plaintiff's expert is surprised by, or the plaintiff's expert maybe has done some additional research, some new studies that have come out since his deposition. There's got to be some reason for the seasonable supplementation. Otherwise, 213 means nothing. Otherwise, 213 means I'll tell you what I think I'm going to tell you now, and four years later, I'll tell you what else I'm going to tell you. Well, 213 is, apparently, the language of 213 is it should be liberally construed. It shouldn't be assigned for purposes of defeating somebody's claim. And it seems to me that you have six months in which to depose Dr. Bernstein regarding the problem of proximate cause. And there was some issue of proximate cause in the initial deposition, but not necessarily relating to the bills. The rule says it is to be liberally construed in order to effect the purposes of the rule, which are to have prompt and full disclosure. And the plaintiff disclosed his expert's opinions four years before the supplemental disclosure. Yes, the plaintiff's attorney and plaintiff's expert said that there were damages proximately caused. He was talking about pain and suffering, and he didn't distinguish between which were due to the ovary removal. Not just a cyst removal, but an oophorectomy is a removal of the entire ovary. He didn't distinguish between the ovary removal and the birth procedure. He also didn't distinguish between what pain she would have had. This is going off to the motion for summary judgment of going back to your point. I don't think that disclosing that the plaintiff's expert thinks that bills that were incurred well before his opinions were ever disclosed are now proximately related. I don't think that's seasonably supplemented. I don't think that's within the spirit of 213. And I don't think there are any cases that talk about 213 that way. It's the whole reason for 213. We go back to 220 and 58. That was how we did things back then. We don't do it that way now. And the cases, the Supreme Court cases, Sullivan directly on point, 213 is to be, is requires disclosure. And they could have brought it out. They could have done it in the disclosure. They could have done it in the deposition. They could have asked him questions in the deposition. Did he have opinions regarding the medical bills? And it would have been new then, but it would have complied under 213. If the ovary problem was never brought up from the time the case started, other than mentioning it in the complaint, until, you know, six months before the trial date, or four years plus past, nobody mentions it, are you asking us to take the position that that's really a significant part of the case that should affect any issue, such as damages, such as proximate cause? I disagree with the plaintiff's position that it was never part of the case. The plaintiff had two procedures on the same date. She consented to the ophorectomy and she consented to the BIRCWH procedure, and she had them both through the same incision in the same part of her body at the same time. If the plaintiff chose not to have his expert address anything to distinguish what would have followed from the ophorectomy and what would have followed from the BIRCWH procedure, that is not the defendant's burden to bring that out. That's the plaintiff's burden to bring that out. He wouldn't be able to bring it out without his expert mentioning it as part of the overall case that's going to be brought before a fact finding. Absolutely. And your doctor didn't mention it at all either. It is true that Dr. Brubaker, our expert, did not mention it because Dr. Bernstein did not mention it. Dr. Bernstein was the plaintiff's expert, and as the plaintiff's expert, the plaintiff had the obligation to bring forth all the elements of his case through his expert. It was his obligation to have Dr. Bernstein say, I don't think the ophorectomy caused any problems. I think all of the damages that she's experiencing were all approximately caused by the BIRCWH procedure. I think that all of her medical bills were approximately caused by the BIRCWH procedure. That's all he had to say, and he didn't say it. There's not one doctor or any piece of evidence in the case that says that the ovary had any connection to do with the plaintiff's injury. Nothing except speculation. There may be a problem with respect to, I mean, common sense tells you that that doctor's not going to do some, I assume, significant surgery and not bill for it. But from the standpoint of the injury, I don't see anything in the record that would reasonably indicate that the ovary had anything to do with the injury-type problems that the plaintiff suffered. I think, Your Honor, that this... I'm sorry. And I was just going to say, when I originally read the briefs and got to that point, I wondered whether or not the issue was totally weighed for purposes of a trial, the issue of the ovary, as to the movement of this entire case for four or five years. I think the speculation is the other way. I think that with the evidence of the oophorectomy surgery being done simultaneously with the BIRCWH procedure surgery, it is speculation for the jury to suppose, as the plaintiff argues, that all the damages came from the BIRCWH procedure without any medical testimony to support that. It is not required for the defense to put on an opinion that the oophorectomy did cause damages. It is the plaintiff's obligation to prove that all of the damages that the plaintiff has flowed from the BIRCWH procedure and not the oophorectomy that was caused at the same time. Some of them. Any of them. Which of them? Point to one thing in the record that an expert or the parties said the pain and discomfort resulting from the surgery had something to do with the removal of the ovary. Just anything in that record. Your Honor is correct that there is nothing in the record that says that. And I believe that that is not the defendant's burden. It is the plaintiff's burden to separate the sequelae from those two procedures. And it would have been simple for Dr. Bernstein to have made a one-sentence statement, which is, none of the problems are due to the oophorectomy. Otherwise, the jury is required to speculate. It is required to do exactly what this Court is doing. And to look at medical records with a lay person's view and say, well, I don't think any of these damages were caused from the oophorectomy. I don't see how they could be. That's a medical opinion and it has to be supported by medical testimony. And the plaintiff doesn't have it. We're at the summary judgment stage now. The issue is whether there's a material question of fact that was raised through all the discovery and the depositions, whether any of the injuries were caused by the Birch procedure, not all of them. I mean, if 99% of the injuries were caused by the ovary operation and 1% was caused by the Birch procedure, wouldn't this case go forward? This case would go forward regardless of how much injuries were due to either one of them. Right. But the plaintiff's burden is to prove that the plaintiff was injured by the proposed treatment. Right. The proposed treatment was the Birch procedure. Right. So there's two points to that. First of all, for a long time, Dr. Bernstein's testimony was, should have had the sling procedure instead of the Birch procedure. And then Dr. Bernstein conceded, well, might have had the same complications with either procedure. So the choice of procedure is out. But she consented to two procedures at the same time. The right ovary was removed and the Birch procedure was performed. And it's their obligation to prove that she was injured by the proposed treatment. There is no testimony to that effect. That is a required element that they are missing. And so on a motion for summary judgment, yes, there is a question of fact as to whether any of the damages were caused by the Birch procedure as opposed to the ovary removal. Because there is no medical testimony to that effect. And the jury can't speculate on it. Well, your time is up. Is there anything additional, any additional points you wish to bring up? I would ask the court to affirm the trial court's decision on both rulings. Thank you. Thank you. Please, Bob. Thank you, Judge. With regard to the agreement that is referred to, that Judge Birch made reference to, there was no assumption here. I was present. I knew what the agreement was. Ms. Spring wasn't part of the agreement. I was. And I knew that it covered all three components, reasonable, customary, and proximate causation. Otherwise, I wouldn't have written a stipulation to that effect, which is part of the record. Did you tell the trial judge that? Huh? Did you tell the trial judge that? I did. But what you just said is not part of the record, however. What? What your understanding of the agreement was. The letters are, but that isn't articulated in the letters. Well, it's articulated in the stipulation that it says those three components, and the cover letter says this reflects our agreement that we had. And then I got a letter back saying this wasn't our agreement. See? And that's the problem, Judge, and that's what led to why we're here today. The, you know, you have a situation about, again, counsel wants to distinguish again between Birch and oophorectomy. We don't, there's no case law that says that an expert has to cover what, exactly what she said, and so you have to come forward with that one sentence. He unequivocally said, Bernstein unequivocally said, it's all related to the Birch procedure. Brubaker, their expert, talks about the Birch procedure, too, and he says, well, we don't have to come forward with it. Well, as I said before, Dr. Brubaker, defendant's expert, clearly could have tried to put a nail in the coffin by saying, what are you talking about? This was all related to the oophorectomy. It wasn't related to the Birch procedure, or as Judge Berkman just mentioned, well, 50 percent of it was related to the oophorectomy. But she didn't. The reason why she didn't, because it is a non-issue. Again, this was only brought up at the time of those motions. It was never raised throughout the entire course of the litigation. There's no speculation. I have a question. I'm sorry. Counsel was questioned by Justice Bowman about this five-month delay in bringing the motion to borrow the expert testimony and the bills. And, again, you agree that the bills were borrowed. Correct. Okay. The five-month delay issue, I take it you did bring that to the trial court's attention. I take it that was argued. I did. But, of course, we don't have a record on how the trial court viewed that five-month delay issue. And we're based on an abuse of discretion standard. We have to, because Judge Stark did not, in making his ruling, did not go into any in-depth analysis about that. But when you look at the Smith decision, you look at the Bidnar decision, it gives you a very good basis by which to reverse here, because the delays there were shorter than this delay that we have here, five-and-a-half months, where they basically, the defendants sat on their hands and then brought the motion. That clearly prejudiced us, did not, and there was no prejudice. There's no surprise to them at all in all this stuff. Again, I do appreciate your time you've given me today and the plaintiff's request that you reverse both decisions so we can have our date in court. Thank you for your time. The case is taken under advisement and the court stands in recess.